REBEKAH SCHULTHEISS, OSB No. 121199
FREEDOM FOUNDATION
PO Box 552
Olympia, WA 98507
RSchultheiss@FreedomFoundation.com
360.956.3482

PAUL D. CLEMENT (*pro hac vice forthcoming*)
ANDREW LAWRENCE (*pro hac vice forthcoming*)
PHILIP HAMMERSLEY (*pro hac vice forthcoming*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Paul.Clement@clementmurphy.com
Andrew.Lawrence@clementmurphy.com
Philip.Hammersley@clementmurphy.com
202.742.8900

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **THE FREEDOM FOUNDATION,** <br><br>     *Plaintiff*, <br><br>         v. <br><br> **DAN RAYFIELD,** *in his official capacity as the Attorney General for the State of Oregon*; the **OREGON EMPLOYMENT RELATIONS BOARD; ADAM RHYNARD,** *in his official capacity as the Board Chair of the Oregon Employment Relations Board*; **SHIRIN KHOSRAVI,** *in her official capacity as a Board Member of the Oregon Employment Relations Board*; **BENJAMIN O'GLASSER,** *in his official capacity as a Board Member of the Oregon Employment Relations Board*; **OREGON AFSCME COUNCIL 75; OREGON AFSCME COUNCIL 75, AFL-CIO LOCAL 2064; SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 503, OREGON PUBLIC EMPLOYEES UNION; OREGON EDUCATION ASSOCIATION; OREGON SCHOOL EMPLOYEES ASSOCIATION,** <br><br>     *Defendants.* | Case No. _____ <br><br><br> **COMPLAINT FOR DE-CLARATORY AND IN-JUNCTIVE RELIEF** |

Plaintiff Freedom Foundation brings this complaint against Dan Rayfield, in his official capacity as the Attorney General for the State of Oregon; the Oregon Employment Relations Board; Adam Rhynard, in his official capacity as the Board Chair of the Oregon Employment Relations Board; Shirin Khosravi, in her official capacity as a Board Member of the Oregon Employment Relations Board; Benjamin O'Glasser, in his official capacity as a Board Member of the Oregon Employment Relations Board (together, the "State Defendants"); Oregon AFSCME Council 75; Oregon AFSCME Council 75, AFL-CIO Local 2064; Service Employees International Union, Local 503, Oregon Public Employees Union; Oregon Education Association; and Oregon School Employees Association (together, the "Union Defendants"), including each State Defendant's or Union Defendant's officers, agents, servants, employees, attorneys, and all persons acting in active concert or participation with any of them, seeking declaratory and injunctive relief against Chapter 307 of the 2025 Oregon Session Laws.

## PRELIMINARY STATEMENT

1.    This lawsuit challenges the latest joint effort by states and public-sector unions to undermine and countermand the Supreme Court's decision in *Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018).  In *Janus*, the Supreme Court held that requiring public-sector employees to pay agency fees to public-sector unions and to thereby subsidize objectionable speech violates the First Amendment.  That decision finding mandatory dues unconstitutional unleashed a robust debate over voluntary membership, *i.e.*, whether individuals should keep paying sizeable union dues or instead opt out and accrue sizeable savings.  Plaintiff Freedom Foundation—a non-profit organization with roots in the Pacific Northwest that has since spread nationwide—has vigorously participated in that debate.  The Foundation's core mission is to educate public-sector employees about *Janus* and to empower employees who no longer wish to see their hard-earned money spent by public-sector unions to opt out of union membership.  Those efforts, accomplished through

mailing campaigns and other outreach, have proven enormously successful. With the Foundation's assistance, hundreds of thousands of employees throughout the United States have opted out of union membership in recent years, including over 30,000 employees in Oregon alone—allowing those Oregon employees to save (and causing their unions to lose) more than $100 million.

2.     These efforts have not gone unnoticed by public-sector unions. Unfortunately, rather than meeting speech with more speech, some public-sector unions have reacted to the Freedom Foundation's effective speech by seeking to suppress it altogether. This litigation concerns the latest such gambit in Oregon. In June 2025, public-sector unions successfully convinced Oregon's legislature to enact a law that the unions themselves had drafted—House Bill 3789 (HB 3789), later enrolled as Chapter 307—which empowers those very unions to bring private lawsuits against individuals or entities that allegedly "impersonate" union representatives. Chapter 307, however, is no ordinary anti-deception law—laws that historically have been comprehensive and content-neutral, rather than targeted to one side of an ongoing debate. Deviating from that traditional, content-neutral model, the proponents of Chapter 307—which takes effect January 1, 2026—drafted and supported it based on the alleged theory that the Foundation's communications informing public-sector employees about their constitutional opt-out rights actually deceived employees into believing that the communications came from the unions themselves. To combat this purported problem, Chapter 307 authorizes public-sector unions to sue their chief organized adversary in this ongoing and constitutionally necessary debate and to collect a $6,250 bounty for each piece of offending mail or email sent by the Foundation. The upshot is that the Foundation faces potential civil liability to the tune of nearly $1 billion just for sending a *single* piece of "unlawful" mail to every public employee in Oregon after January 1.

3.      The Constitution does not tolerate this blatant attempt to skew an ongoing and constitutionally necessary debate, and this Court should preliminarily and permanently enjoin Chapter 307 as applied to the Freedom Foundation as an ongoing and obvious affront to the First Amendment.  The Foundation is exceedingly likely to succeed on the merits—Chapter 307 is unconstitutional several times over—and the other factors support preliminary relief.  Chapter 307 draws unjustified content- and viewpoint-based distinctions; it targets core political advocacy; it coerces speakers to alter their messages with source-identifying disclaimers; and it is impermissibly vague.  More broadly, it impermissibly picks sides in a debate in which the First Amendment itself requires the government to remain neutral.  The remaining equitable factors strongly support more speech, not less speech, as this litigation proceeds.  The Foundation's loss of constitutional freedoms is irreparable, and Oregon has no legitimate interest in enforcing a law that violates the Constitution, especially when neutral laws against deception remain on the books. Chapter 307 has already forced the Foundation to add prominent and unwanted disclaimers to its materials and to alter its schedule of sending the mailers that are the lifeblood of its advocacy. That state of affairs is intolerable.  The Court should preliminarily and permanently enjoin Chapter 307 and enable the Foundation to resume its constitutionally protected speech without fear of ruinous liability.

## PARTIES

4.      Plaintiff Freedom Foundation is a non-profit corporation headquartered in Olympia, Washington, with a presence in Oregon.  The Foundation is dedicated to informing public-sector employees of their First Amendment right to be free from union membership and from supporting union speech.  The Foundation also provides assistance to public-sector employees who wish to take the steps necessary to refrain from union membership and dues deductions.

4

5.      Defendant Dan Rayfield is the Oregon Attorney General.  In that capacity, he serves as "the chief law officer for the state and all its departments," O.R.S. §180.21;, has "[g]eneral control and supervision of all civil actions and legal proceedings in which the State of Oregon may be a party or may be interested," *id.* §180.220(1)(a); and is empowered to intervene to defend the constitutionality of state statutes when they are challenged in private litigation, *see id.* §28.110; 28 U.S.C. §2403(b); *see also* O.R.S. §180.060.

6.      Defendant Oregon Employment Relations Board ("ERB") is the state agency tasked with policing unfair labor practices within the state.  O.R.S. §243.766(3).

7.      Defendant Adam Rhynard is sued in his official capacity as Chair of ERB.

8.      Defendant Shirin Khosravi is sued in her official capacity as a member of ERB.

9.      Defendant Benjamin O'Glasser is sued in his official capacity as a member of ERB.

10.      Defendant Oregon AFSCME Council 75 is a labor organization that represents state, county, city, and nonprofit workers throughout Oregon.  Oregon AFSCME Council 75's principal place of business is located at 1400 Tandem Ave NE, Salem, OR, 97301.

11.      Defendant Oregon AFSCME Council 75, AFL-CIO Local 2064 is an affiliated local union of Oregon AFSCME Council 75 and represents bargaining-unit employees of Benton County, Oregon.

12.      Defendant Service Employees International Union Local 503, Oregon Public Employees Union ("SEIU 503") is a labor organization that represents public-services workers and care providers in Oregon.  SEIU 503's principal place of business is located at  3470 Pipebend Place NE, Suite 130, Salem, Oregon 97301.

13.     Defendant Oregon Education Association ("OEA") is a labor organization that represents Oregon educators and is the Oregon affiliate of the National Education Association. OEA's principal place of business is located at 6900 SW Atlanta St., Portland, OR 97223.

14.     Defendant Oregon School Employees Association ("OSEA") is a labor organization that represents Oregon educators and is an Oregon affiliate of the American Federation of Teachers (AFT), AFL-CIO.  OSEA's principal place of business is located at 4735 Liberty Rd. S., Salem OR, 97302.

## JURISDICTION AND VENUE

15.     The Freedom Foundation's causes of action arise under 42 U.S.C. §§1983 and 1988 and the U.S. Constitution.  The Court therefore has jurisdiction under 28 U.S.C. §1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §§2201(a)-2202.

16.     Venue is proper in the District of Oregon under 28 U.S.C. §1391(b)(1) and (2) because all Defendants reside in Oregon (and thus in this District).  Furthermore, because the challenged law is administered and will be enforced in Oregon, a substantial part of the events giving rise to the Freedom Foundation's claims occurred in this District.

## BACKGROUND

**A.     The Freedom Foundation and its Speech**

17.     Since the Nation's earliest days, Americans have used handbills, flyers, and pamphlets to disseminate ideas and rally support for social and political causes.   Thomas Paine and other revolutionaries circulated *Common Sense* to galvanize support for independence. Abolitionists launched the Nation's first direct-mail campaign in the 1830s, using the postal system

to send anti-slavery pamphlets.  And in the 20th century, suffragettes distributed leaflets and postcards urging the public to support "Votes for Women."

18.     That tradition is especially rich in the labor context.  For over a century, unions and their critics have used mailers and handbills to persuade workers and to shape the debate over wages, working conditions, and union representation.  Pro-labor forces distributed pamphlets to educate workers about the benefits of unionization and to call for strikes.  By contrast, labor skeptics circulated their own flyers arguing against unionization and criticizing union leadership. That back-and-forth of speech and counter-speech reflects the First Amendment's premise that civic disputes are best resolved through the marketplace of ideas rather than government favoritism.  Thus, when states use legislative fiat to skew that longstanding debate over labor relations, courts (including the Supreme Court) have not hesitated to strike down those efforts under the First Amendment.  *See, e.g.*, *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) (holding unconstitutional a law with a pro-labor exception to picketing regulations); *Thornhill v. Alabama*, 310 U.S. 88 (1940) (holding unconstitutional a law banning labor picketing).

19.     The Freedom Foundation has been an active participant in this rich historical debate by using mailers and the digital medium to advance its mission.  Established in 1991 in Washington state, the Foundation exists to promote free markets and limited, accountable government.  It does so in part by educating public-sector employees about their workplace and constitutional rights and by encouraging them to exercise their constitutional right to opt out of public-sector unions. The essential tools that the Foundation uses to accomplish that goal are direct-to-union-member mailers, billboards, and speech on online platforms.

### B.     *Janus* and the Post-*Janus* Legal Landscape

20.     The legal principles governing public-sector unions changed dramatically in 2018 when the Supreme Court issued its decision in *Janus*.  *Janus* involved a First Amendment

challenge to a state law requiring public-sector employees to pay certain union dues even if they did not join the union and even if they objected to the positions that the union advocated. *See* 585 U.S. at 884-86. In the course of holding that law unconstitutional, the Supreme Court reaffirmed that forcing "individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command." *Id.* at 892. Just as requiring individuals to affirm particular beliefs violates the First Amendment, so too do laws "[c]ompelling a person to *subsidize* the speech of other private speakers." *Id.* at 893. The Supreme Court thus struck down the state law at issue and admonished that "States and public-sector unions may no longer extract [union dues] from nonconsenting employees." *Id.* at 929. Instead, unions may collect such fees only when "the employee" waives her First Amendment rights by "affirmatively consent[ing] to pay" those dues. *Id.* at 930.

21.     After *Janus*, the Freedom Foundation doubled down on its efforts to educate public-sector employees about their constitutional prerogative not to subsidize public-sector unions and to assist those same employees to exercise their opt-out rights. Among other things, the Foundation launched an initiative called "Opt Out Today" to inform public-sector employees about when and how they could leave their unions, along with the amount of money that they could save by opting out. The Foundation also continued to send materials directly to public-sector employees, such as the "St. Paddy's Day" mailer below:

**Front**                    **Back**



22.    The mailer informs members of one public-sector union in Oregon—SEIU Local 503—that they can save hundreds of dollars by opting out, and it includes a pre-addressed reply mailer that the union member can sign and send to the Foundation (which will then transmit her opt-out form to the union) in order to resign her union membership.  The mailer identifies that it is from "Freedom Foundation," and the opt-out form specifies that the signee authorizes "the Freedom Foundation" to transmit the form on the signee's behalf.

23.    The Freedom Foundation has also regularly distributed other mailers educating members about how much they paid annually in union dues.  The "Check" mailer uses a mockup of a check to illustrate the potential savings to union members if they exercise their opt-out rights:

24.     Like the St. Paddy's Day mailer, the Check mailer informs union members that they have a constitutional right under *Janus* to opt out of paying union dues and gives them an opt-out form to sign and return to the Freedom Foundation.  The envelope (not pictured) identifies the "Freedom Foundation" as the source of the communication.

25.     The Freedom Foundation also maintains the Opt Out Today website to provide further information to union members and additional opt-out assistance.  Some mailers, moreover, have included QR codes that direct union members to the Foundation's Opt Out Today website, where they can complete an opt-out form tailored to their specific union.  The website below—which is specific to members of OSEA—is illustrative:



26.    The Freedom Foundation's outreach to public-sector employees has proven remarkably effective.  Since 2018, the Foundation has helped over 250,000 public employees across the Nation opt out of their union.  Those opt outs have saved public employees over $700 million in dues.    In Oregon alone, the Foundation has assisted over 30,000 public-sector employees leave their unions, saving them more than $100 million in dues

### C.    Oregon Enacts Chapter 307

27.    Of course, every dollar that a public-sector employee *saves* on dues is a dollar that the public-sector union does not *receive* in dues.  Unions thus have powerful financial incentives to deter opt outs—and to silence organizations like the Freedom Foundation that educate union members about their constitutional rights and the process for effectuating those rights.

Hemorrhaging members and dues revenue, and unable to convince many public-sector employees of the value of maintaining union membership on the merits, public-sector unions—including Defendants AFSCME Council 75, SEIU Local 503, OSEA, and OEA—turned to the Oregon legislature for help.

28.    Enter House Bill 3789—later enrolled as Chapter 307—which the Oregon legislature passed and the governor signed in June 2025.  As of January 1, 2026, that legislation makes it illegal "for any person to falsely impersonate a union representative."  2025 Or. Laws Ch. 307, §1(2).

29.    An entity commits that offense if it uses:

> fraud or misrepresentation to make a verbal or written communication that purports to be authorized or otherwise approved by a labor organization but that has not, in fact, been authorized or approved by the labor organization, with the intent to undermine or interfere with the operations of the labor organization, or otherwise negatively impact the labor organization.

§1(1)(c).    Chapter 307 defines "[f]raud or misrepresentation" to mean "the intentional misrepresentation or misstatement of a material fact, concealment of or failure to make known any material fact, or any other means by which misinformation or a false impression knowingly is given."  O.R.S. §677.188(1); *see* §1(1)(d) (incorporating O.R.S. §677.188).  The law in turn defines a "labor organization" as "any organization that has as one of its purposes representing employees in their employment relations with public employers."  O.R.S. §243.650(13); *see* §1(1)(b) (incorporating O.R.S. §243.650).  Chapter 307 creates a private cause of action for union representatives "alleging a violation" of the law.  §1(4)(a).  Unions that sue may seek damages "in an amount of $6,250 per incident in any action in which the plaintiff establishes that the defendant falsely impersonated a union representative."  §1(4)(b).

30.    Though dressed up in the language of an anti-deception statute, Chapter 307 designedly chills speech and skews the debate in ways that neutral anti-deception laws—which were *already* on the books long before Chapter 307's enactment—do not permit.  *See, e.g.*, O.R.S. §165.815.  For example, criminal impersonation requires a jury to find proof of injury, an intent to deceive a third party, and that a reasonable person in the shoes of that third party would believe that she is speaking with the impersonated individual.  *See id.*; *see also id.* §30.863 (granting a civil action for compensatory damages to individuals harmed by criminal impersonation).  More important, neutral anti-impersonation statutes apply equally to participants on both sides of ongoing debates on all manner of contentious issues, from access to abortion clinics to labor unions to statewide referenda.  Chapter 307, by contrast, requires far less proof, features fewer procedural protections, and applies to only one side of the debate.  It is written in a way that plainly chills far more speech on one side of the debate and would allow public-sector unions to target entities like the Freedom Foundation merely for informing public-sector employees about their constitutional rights.

31.    That is no accident.  During committee hearings, legislators candidly identified the "legal team behind the bill" as a law firm that represents labor unions.  *See* Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 48:26-48:29, 51:38-51:57 (Mar. 31, 2025), https://tinyurl.com/ywwub64m.  Legislative proponents urged passage of Chapter 307 as a response to communications distributed by "anti-union" and "union busting" organizations. Oregon State Legislature, S. Comm. on Labor & Business, at 45:45-45:50, 46:57-47:04 (May 8, 2025), https://tinyurl.com/5xmrjbwj; Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:20:30-1:21:10 (Mar. 10, 2025), https://tinyurl.com/mr8ksc8c.

32.     In fact, they focused solely and wholly on the Freedom Foundation's mailers. Lawmakers remarked that "the Freedom Foundation was singled out by name multiple times" during committee hearings, Oregon State Legislature, House Chamber, at 3:06:26-3:06:36 (Apr. 10, 2025), https://tinyurl.com/43beckjk, and the only evidence of so-called impersonating communications that proponents could muster came in the form of mailers from the Foundation, *see* Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:05:10-1:06:17 (Mar. 10, 2025), https://tinyurl.com/mr8ksc8c; Oregon State Legislature, S. Comm. on Labor & Business, at 46:10-46:20 (May 8, 2025), https://tinyurl.com/5xmrjbwj.  Legislative proponents identified the "Check" mailer reproduced above as an example of the "deceptive fliers" that Oregon needed to outlaw.  Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 51:55-52:30 (Mar. 31, 2025), at https://tinyurl.com/ywwub64m.

33.     They also pointed to the Opt Out Today website excerpted above as another justification for enacting Chapter 307.  *See* Oregon State Legislature, House Chamber, at 3:41:41-3:43:25 (Apr. 10, 2025).  And after one union official recounted mailers from the Freedom Foundation, he had a simple request for the legislature:  "tell them to stop."  Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:05:10-1:06:17 (Mar. 10, 2025).

**D.     Chapter 307 Chills and Distorts The Foundation's Speech**

34.     After reviewing Chapter 307, and in light of the considerable evidence that Oregon enacted the law in response to the Freedom Foundation's specific activities, the organization took several steps to avoid exposure to liability.

35.     First, the Foundation added a prominent disclaimer that readers must review and acknowledge before accessing the portion of the Opt Out Today website that provides information about public-sector unions in Oregon:



36.    The Freedom Foundation has likewise added prominent disclaimers to mailers that it will send in January 2026 and beyond.  It has done so based on the credible fear that, in the absence of the disclaimers, its communications would open the Foundation to liability.  It would not have added these disclaimers but-for Chapter 307.

37.    Second, the Freedom Foundation reluctantly decided not to distribute its regularly scheduled mailers.  That includes (among others) the New Year's postcard depicted below that the Foundation intends to send in January 2026 to public-sector employees in other states:



38.     The Freedom Foundation would have sent this postcard to public-sector employees that belong to the Union Defendants in Oregon but for Chapter 307.  The Foundation made the decision not to distribute that postcard, along with the other regularly scheduled mailers, based on its credible fear that those mailers would violate Chapter 307 and subject the Foundation to liability.

39.     That fear is particularly credible based on union correspondence that the Freedom Foundation recently received in response to a FOIA request.  Following Chapter 307's enactment, the Foundation requested information about public-sector employees working for Benton County. After providing that information, Benton County officials notified the employees about the Foundation's FOIA request.  Union officials from Oregon's Local AFSCME Chapter likewise learned about the Freedom Foundation's FOIA request, warned its members that the Foundation "is an organization founded specifically to eradicate public sector unions," and stated that the Foundation will "attempt to get your home address … so they can send post cards."  The AFSCME official asked members to pass along any mailers from the Foundation that they received so that the union officials could "review" them.  The union official further noted that "*[w]e* recently passed HB 3789 which prevents anyone from impersonating a Union representative," and he stated that some mailers from the Foundation "are so similar to union materials that [they] could violate this new law."

40.     The Freedom Foundation strongly desires to resume engaging in its constitutionally protected speech and would not have made any of these changes but for Chapter 307 and the *in terrorem* threat of civil liability and enforcement actions.  Specifically, the Foundation would like to remove the disclaimer on its website.  The Foundation would also like to resume its mailing

campaign—which, in 2025, involved approximately 35 tranches of mailers sent to an average of 53,000 public-sector employees who are members of the Union Defendants.

41.    For example, in the past, the Freedom Foundation has sent the Check and St. Paddy's Day mailers depicted above to public-sector employees in Oregon.  But for Chapter 307, the Foundation would send substantially similar mailers to public employees who are members of the Union Defendants in 2026 and on an ongoing basis in the following years.  The Foundation has also sent the "Voluntary Dues Notice" Letter depicted below to public-sector employees in Oregon:



42.    But for Chapter 307, the Foundation would send substantially similar mailers to public-sector employees who are members of the Union Defendants in 2026 and on an ongoing basis in the following years.

43.     In addition to those specific mailers, the Freedom Foundation would like to send numerous creative and compelling opt-out messages themed around national holidays, tax-season savings opportunities, the anniversary of the *Janus* decision, union policies arbitrarily restricting when members may successfully exercise their opt-out rights, and a variety of current events and other cultural, political and ideological issues on an ongoing basis in the coming years to public-sector employees throughout Oregon. to public-sector employees throughout Oregon.   The Foundation, however, has abstained and will abstain from all of this activity as long as Chapter 307 remains on the books.

### CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment—Content & Viewpoint Discrimination
### (42 U.S.C. §1983; *Ex parte Young*)

44.     Freedom Foundation re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

45.     The First Amendment prohibits persons acting under color of state law from restricting "expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*  An even "'more blatant' and 'egregious' form of content discrimination" is viewpoint discrimination, which occurs when the government regulates speech "based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* at 168.

46.     Chapter 307 impermissibly regulates based on content and viewpoint.

47.     Chapter 307 regulates based on content because it "singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en

banc). The law prohibits communications that falsely "purport[] to be authorized … by a labor organization," §§1(1)(c), (2), which is defined as "any organization that has as one of its purposes representing employees in their employment relations with *public* employers," O.R.S. §243.650(13); *see* §1(1)(b) (adopting O.R.S. §243.650(13)'s definition of "labor organization"). Put another way, individuals are free to falsely impersonate unions—so long as those unions do not represent *publi*c-sector employees and instead represent *private*-sector employees. The law thus discriminates based on content on its face. That distinction is particularly suspicious here, moreover, because it singles out for differential treatment unions whose members have heightened First Amendment protection, thus raising the specter that the real purpose behind the rule is to retard the ability of public-sector union members to exercise their constitutional right to opt out.

48.     More perniciously, Chapter 307 also regulates based on viewpoint and again does so on its face. "The text of the statute alone shows it is meant to protect" unions from anti-union speech. *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021). Impersonating communications are off-limits *only* when offered with "the intent to undermine or interfere with the operations of the labor organization, or otherwise negatively impact the labor organization." §1(1)(c). So, if someone impersonated a union representative for the purpose of *helping* the labor organization—*e.g.*, to dupe public-sector employees into opting into the union, or to encourage union members to ignore perfectly truthful communications from the Freedom Foundation—that person would not fall within the scope of the statute.

49.     The sizable and "disproportionate sanctions" that individuals or entities face for violating Chapter 307 also "evidences the [state's] desire to suppress … speech." *Valle del Sol Inc. v. Whiting*, 732 F.3d 808, 819, 820 (9th Cir. 2013). Most Oregon laws creating private causes of action that also afford statutory damages provide substantially less than $6,250 in damages.

*See, e.g.*, O.R.S. §133.875(1)(c)(B), (2)(c)(B) ($500 and $1,000 in damages for unlawfully retaining or displaying booking photos); *id.* §30.845(2)(a)(B) ($250 in damages for using the police against another person with intent to harm); *id.* §646.638(1) ($200 in damages for unlawful trade practices); *id.* §646.641(1) ($1,000 in damages for unlawful debt collection practices); *id.* §30.851(2)(b) ($500 or $5,000 per day in damages for interfering with healthcare personnel or facilities). Even far more culpable conduct—like intentionally sharing someone's intimate images—receives less serious penalties than the damages imposed here. *See id.* §30.833(1). And if the Freedom Foundation delivered a mailer deemed unlawful only to 100 people, it would have to pay nearly *ten times* as much in statutory damages as the state would owe for wrongfully imprisoning someone for a year. *See id.* §30.657(5)(a)(A). The wildly disproportionate penalties that someone faces for violating Chapter 307 further proves its impermissible purpose.

50.    Although Chapter 307's plain text suffices to expose the content and viewpoint discrimination, the legislative record only buttresses that conclusion. To start, the legislative record is clear that labor organizations drafted Chapter 307 to enrich and protect themselves. During committee hearings, legislators identified the "legal team behind the bill" as a law firm that represents labor unions. Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 48:26-48:29, 51:38-51:57 (Mar. 31, 2025), https://tinyurl.com/ywwub64m. And union officials testifying in favor of the bill candidly acknowledged the "iterative" process that they (not elected officials) went through "with many kinds of lawyers" to craft Chapter 307's provisions. Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:15:41-1:16:40 (Mar. 10, 2025), https://tinyurl.com/mr8ksc8c. Unsurprisingly, then, Chapter 307 singles out a particular type of union for special protection, provides those same unions exclusive power to enforce the

new law, and allows those unions to collect lucrative bounties whenever a person or organization runs afoul of the new law's vague provisions.

51.     The legislative record is replete with evidence that the unions drafted Chapter 307 to "silence disfavored speech" and to prop up labor organizations. *United States v. Griefen*, 200 F.3d 1256, 1265 (9th Cir. 2000). Proponents repeatedly and consistently decried communications distributed by "anti-union" and "union busting" organizations, and they attributed those communications to groups "funded by conservative think tanks" and people that want to "get rid of public education altogether." Oregon State Legislature, S. Comm. on Labor & Business, at 45:45-45:50, 46:57-47:04 (May 8, 2025), https://tinyurl.com/5xmrjbwj; Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:20:30-1:21:10 (Mar. 10, 2025), https://tinyurl.com/mr8ksc8c. They lauded Chapter 307 as "critical [to] keeping [union] membership safe from … *anti-union groups*," Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:21:28-1:21:44 (Mar. 10, 2025) (emphasis added), https://tinyurl.com/mr8ksc8c, and urged lawmakers to enact the bill "to protect [union] members" by "afford[ing] the union an opportunity to speak to the members and let them know what dropping their membership will mean to them," Letter from Sarah Wofford, OSEA, to Sen. Kathleen Taylor et al., at 1 (May 6, 2025), https://perma.cc/33ZC-M2WJ. Time and again, legislative proponents focused on the alleged benefits that unions provide—and the harmful consequences that follow from weakening the union by encouraging opt-outs—instead of providing credible evidence regarding efforts to impersonate union officials. *See, e.g.*, Oregon State Legislature, S. Comm. on Labor & Business, at 47:06-47:54 (May 8, 2025) (testifying that "we all know the value that a union brings to the working class" and arguing that Chapter 307 "protects union workers" and "protects Oregon's values"), https://tinyurl.com/5xmrjbwj; Letter from Susan Miller, OSEA, to

Sen. Kathleen Taylor et al., at 2 (May 6, 2025), https://perma.cc/E8CE-9SXB ("[w]hile the mailers say rights and benefits will remain the same after dropping membership, what they don't say are the real consequences of union destroying efforts")

52.     Indeed, the record contains considerable evidence that Chapter 307 targets the Freedom Foundation specifically. One legislative proponent gave an "exampl[e]" on the House floor of the conduct that the bill sought to combat: a website created by the Foundation to facilitate OSEA members to opt out of their union. Oregon State Legislature, House Chamber, at 3:41:41-3:43:25 (Apr. 10, 2025), https://tinyurl.com/43beckjk. The lawmaker expressly described the website as "a project of the Freedom Foundation," *id.* at 3:43:06-3:43:08, and explained why she deemed it deceptive, *id.* at 3:42:00-3:43:25. Other lawmakers remarked that "the Freedom Foundation was singled out by name multiple times" during committee hearings. *Id.* at 3:06:26-3:06:36. One of the attorneys behind the bill testified about "deceptive fliers" that "appear to be" from the union itself and include, for example, fake checks "from the Freedom Foundation." Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 51:55-52:30 (Mar. 31, 2025), at https://tinyurl.com/ywwub64m. And the only evidence of so-called impersonating communications that proponents could muster came in the form of mailers from the Freedom Foundation, *see, e.g.*, Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:05:10-1:06:17 (Mar. 10, 2025), https://tinyurl.com/mr8ksc8c; Oregon State Legislature, S. Comm. on Labor & Business, at 46:10-46:20 (May 8, 2025), https://tinyurl.com/5xmrjbwj, sometimes deceptively edited to remove information identifying Freedom Foundation as the speaker, *see* Letter from Ben Straka, Freedom Foundation, to the House Committee on Labor & Workplace Standards, at 2 (Mar. 12, 2025), https://perma.cc/2SGN-BHAC. After one union official recounted various mailers from the Foundation, he insisted that the legislature should "tell

them to stop." Oregon State Legislature, H. Comm. on Labor & Workplace Standards, at 1:05:10-1:06:17 (Mar. 10, 2025). Chapter 307 does exactly that: It seeks to stop the Foundation from attempting to convince union members to exercise their constitutional right to opt out and clears a path for pro-union messaging.

53.    Because Chapter 307 discriminates based on content and viewpoint, it must survive strict scrutiny, *see First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017)—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Strict scrutiny requires proof that the law furthers a compelling governmental interest and is narrowly tailored to that end." *X Corp. v. Bonta*, 116 F.4th 888, 903 (9th Cir. 2024). Thus, "[i]f a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). Chapter 307 comes nowhere close to satisfying that test.

54.    The state cannot "identify an 'actual problem' in need of solving" or prove that "the curtailment of free speech [is] necessary to the solution." *Frudden v. Pilling*, 877 F.3d 821, 828-29 (9th Cir. 2017). The state cannot identify any instances in the legislative record where lawmakers received actual evidence of fraud or impersonation. The principal evidence that legislative proponents relied on included a Freedom Foundation mailer that a third party had deceptively edited to remove language identifying the Foundation (rather than the union) as the source of the mailer. The record is entirely devoid of evidence that speakers are in fact impersonating union officials in an attempt to trick union members into opting out. Even if such evidence existed, moreover, the state cannot show that Chapter 307's sweeping prohibitions are "necessary to the solution." *Frudden*, 877 F.3d at 828-29. There are numerous less restrictive content- and viewpoint-neutral alternatives that the state can use to target true instances of fraud

and impersonation, such as laws already on the books that protect against fraud and misrepresentation. Indeed, the state's failure to "actually consider[] and reject[] the efficacy of [such] less restrictive measures" by itself dooms the law. *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989 (9th Cir. 2008).[1]

## COUNT TWO
### First Amendment—Infringement of Protected Speech
### (42 U.S.C. §1983; *Ex parte Young*)

55.    The Freedom Foundation re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

56.    "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed*, 576 U.S. at 163.    That constitutional guarantee reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).    "Accordingly, 'speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).    Laws that burden such speech are "subject to strict scrutiny, which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Chapter 307 triggers and fails such scrutiny.

---

[1] To be clear, holding Chapter 307 unconstitutional would not render unions powerless to redress genuine instances of fraud and impersonation.  As noted, Oregon already criminalizes impersonation and identity fraud, *see* O.R.S. §165.800; *id.* §165.815, and it gives aggrieved individuals a civil action to recover damages for fraud and impersonation, *see id.* §30.863; *Onita Pac. Corp. v. Trustees of Bronson*, 843 P.2d 890 (Or. 1992) (recognizing tort actions for fraud and misrepresentation).  That likely explains why Chapter 307 expressly provides that the $6,250 bounty is available "[i]n addition to and not in lieu of any other damages that may be claimed," §1(4)(b).

57.    The "text and context" of Chapter 307 confirm that the law regulates protected speech on matters of public importance. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017). The Freedom Foundation both educates public-sector union members about their constitutional right not to pay union dues and assists those members to exercise that right. It does so by using time-honored tools of political advocacy—including informational mailers, online materials, and volunteer assistance—to help employees understand and exercise their rights. That speech unquestionably concerns matters of substantial public importance and thus lies at the heart of the First Amendment's protections. Indeed, the speech at issue here is not just constitutionally protected, but constitutionally necessary. The whole point of *Janus* was that objecting employees could not be coerced by state action into supporting public-sector unions with which they disagree; the First Amendment required support for public-sector unions to be a voluntary one produced by open and robust debate, rather than coercive state action.

58.    Perhaps because the Freedom Foundation's speech was making voluntary choice a reality in ways that harmed public-sector unions' bottom lines, the unions reacted with Chapter 307. The unions shepherded Chapter 307 through the Oregon legislature with an undisguised intent to burden the Freedom Foundation. The law targets for regulation the mailers and pamphlets that the Foundation has distributed for years in an effort to promote awareness among union members of their constitutional rights. The legislative record is teeming with evidence that Chapter 307 exists to punish the Foundation's speech—indeed, both the law's legislative sponsors and its proponents expressly identified Foundation materials as proof of the "impersonation" that the law sought to prohibit.

59.    That Chapter 307 describes the regulated speech as a species of "fraud and misrepresentation" does not cure the constitutional problem. Although the First Amendment does

not protect fraud, *see Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976), "the government cannot label certain speech as fraudulent so as to deprive it of First Amendment protection," *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). The same goes for misrepresentation. *See, e.g.*, *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194-99 (9th Cir. 2018). Speech is regulable as fraud or misrepresentation only if it inflicts (or intends to inflict) a "legally cognizable harm." *See United States v. Alvarez*, 567 U.S. 709, 719 (2012) (plurality op.); *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 612 (2003).

60.    Here, Chapter 307 sweeps in vast swaths of protected expression because it prohibits speech that neither causes nor intends to cause legally cognizable harm. To recover the $6,250 bounty, Chapter 307 does not require the union plaintiffs to show any actual harm from the allegedly impersonating speech. The law bans speech that spreads misinformation or omits material facts when delivered with the intent to "negatively impact the organization." §1(c). That leaves open the possibility that (for example) a mailer sent to union members that uses the same color scheme and font as the union—and distributed with the intent to convince members to exercise their right to opt-out—would trigger liability. After all, the union could argue that (1) the similar color scheme conveys the impression that the union "authorized or … approved" the mailer, (2) the speaker's use of that color scheme or failure to prominently disclaim affiliation with the union either spread "misinformation" or failed "to make known [a] material fact," and (3) the desire to encourage opt-outs "negatively impact[s] the labor organization" by reducing its membership and losing costly union dues. §§1(c), (d); *see* O.R.S. §677.188.

61.    Because Chapter 307 burdens the Freedom Foundation's constitutionally protected speech, it is subject to strict scrutiny. *See Citizens United*, 558 U.S. at 340. The law fails that demanding test for the same reasons articulated above. *See supra*, ¶¶53-54.

## COUNT THREE
### First Amendment—Compelled Speech
### (42 U.S.C. §1983, *Ex parte Young*)

62.     The Freedom Foundation re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

63.     "The 'right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.'" *Frudden*, 742 F.3d at 1202-03 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "A direct disclosure requirement that 'compel[s] individuals to speak a particular message' or '*alter[s] the content*' of protected speech is generally viewed as a content-based 'compelled speech' requirement subject to strict scrutiny." *PhRMA v. Stolfi*, 153 F.4th 795, 810 (9th Cir. 2025) (emphasis added).

64.     Chapter 307 violates the First Amendment's prohibition against compelled speech. Chapter 307 effectively compels speech by conditioning the Freedom Foundation's ability to deliver its communications on the use of prominent disclosures stating the source of the message. If the state compelled organizations to alter their speech by including prominent disclosures about the identity of the speaker along the content-and-viewpoint-based lines that Chapter 307 draws, that would trigger (and fail) strict scrutiny.

65.     The state cannot circumvent the compelled-speech doctrine by forcing entities to include disclosures to avoid liability, as the government cannot "achieve indirectly that which it could not do directly." *Cf. La. Pac. Corp. v. Beazer Materials & Servs., Inc.*, 842 F.Supp.1243, 1251 (E.D. Cal. 1994).    And here, Chapter 307's coercive consequences are already on full display.  The Freedom Foundation has had no choice but to add prominent disclaimers to its constitutionally protected speech that it would not otherwise include but-for Chapter 307's

provisions. *See supra*, ¶¶35-43. Oregon's law effectively compels those disclaimers because it provides no obvious way for the Foundation to engage in its protected speech without risking crippling civil liability.

66.    Nor can the state justify that compelled speech as necessary to further any compelling interest. The First Amendment has long protected the right for speakers to engage in *anonymous* speech. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342-43 (1995) ("an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment"). It follows *a fortiori* that states cannot compel speakers to utter source-identifying disclaimers under the guise of anti-impersonation laws.

## COUNT FOUR
### Due Process Clause—Void for Vagueness
### (42 U.S.C. §1983, *Ex parte Young*)

67.    Freedom Foundation re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

68.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *United States v. Backlund,* 689 F.3d 986, 996 (9th Cir. 2012). "A statute is void for vagueness if it 'fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013) (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011)).

69.    Importantly, the Due Process Clause "demands a greater degree of specificity" from the law when—as is true here—it "is capable of reaching expression sheltered by the First Amendment." *Lane v. Salazar*, 911 F.3d 942, 950 (9th Cir. 2018). In that context, a statute's vagueness exceeds constitutional limits if its "deterrent effect on legitimate expression is … both

real and substantial, and if the statute is [not] readily subject to a narrowing construction by the state courts." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976).

70.    The first vagueness problem with Chapter 307 is that it does not adequately define the *actus reus*. Oregon's law prohibits speakers from "falsely impersonat[ing] a union representative," §1(2), which occurs when the speaker uses "fraud or misrepresentation to make a verbal or written communication that purports to be authorized or otherwise approved by a labor organization but that has not, in fact, been authorized or approved by the labor organization," §1(1)(c). The law in turn defines "fraud or misrepresentation" to include "the intentional misrepresentation or misstatement of a material fact, concealment of or failure to make known any material fact, *or any other means by which misinformation or a false impression knowingly is given*." O.R.S. §677.188(1) (emphasis added); *see* §1(1)(d).

71.    The residual clause in Chapter 307—which prohibits speakers from using "any other means" to knowingly convey "misinformation or a false impression"—fails to inform persons of ordinary intelligence about what conduct the law covers. Chapter 307 does not define "misinformation" or "false impression." Nor does it provide "explicit standards" for distinguishing misinformation and false impressions from the ordinary components of political mailers—taglines, partial quotations, attention-grabbing headlines, design choices, and contextual framing. *Edge v. City of Everett*, 929 F.3d 657, 665 (9th Cir. 2019). And whereas the statute's misstatement and omission prongs are expressly limited to "material" facts, the residual clause is not. That clause sweeps in "any other means" of generating "misinformation" or a "false impression"—and thus even mailers that are literally true on their face could violate the law because of an asserted implied message, with no materiality limit to cabin that theory. The Freedom Foundation thus cannot know *ex ante* whether union members will find its speech

misleading—because, for example, it uses the union's name on the mailer or a similar color scheme as union documents.  Rather, all that the Foundation can do is guess what the law requires and hope that it does not face severe sanctions.  Nor can the Foundation hope that government officials provide administrative guidance about the statute's scope or exercise prosecutorial discretion in limiting the statute's reach.  By empowering unions to bring civil enforcement actions, backed by enormous penalties, the sword of Damocles hangs over the Foundation while the state hands the power to wield that sword to the other side of the ongoing debate.

72.    The legislative record reinforces that Chapter 307 is hopelessly vague.  The text of the statute purports to limit the proscribed conduct to "falsely impersonat[ing] a union representative."  §1(2).  A reasonable person may think that mailers or websites that contain direct attribution to the Freedom Foundation do not run afoul of that provision.  But many legislators apparently thought to the contrary; indeed, the *raison d'être* of the law is to address the allegedly "misleading" and deceptive nature of the Foundation's outreach.

73.    The inevitable (and likely *intended*) consequence of Chapter 307's ambiguity combined with ability of unions to bring actions to enforce this vague law is to chill the Freedom Foundation's core protected speech.  For years, the Foundation has distributed mailers and pamphlets informing union members of their constitutional right to opt out of public-sector unions. *See supra*, ¶¶19-41.  It has done so through the very mailers that Chapter 307's advocates identified as covered by the law.  *See supra*, ¶¶51-52.  Although the Foundation disputes that its mailers *are* misleading, the breadth and ambiguity of the law make it impossible for it to know whether the communications that it has issued for years will result in financial penalties so severe as to threaten bankrupting the organization.  That has deterred the Foundation from engaging in core political speech, which is precisely what the vagueness doctrine seeks to prevent.

74. Chapter 307's *mens rea* requirement is also impermissibly vague. The law prohibits individuals from giving false impressions about union affiliation when done with the "intent to undermine or interfere with the operations of the labor organization, *or otherwise negatively impact the labor organization*." §1(1)(c) (emphasis added). Beyond making the viewpoint-discriminatory nature of the law undeniable, *see supra*, ¶¶44-55, the exact boundaries of what "negatively impact the labor organization" means in this context are far from clear.

75. Suppose the Freedom Foundation delivers mailers stating truthful information about a union member's opt-out rights with the intent to convince that member to exercise those rights to opt out. Does the Foundation act with the guilty mental state, even though its subjective purpose is merely to encourage public-sector employees to exercise their First Amendment right to opt out of union membership? *See Janus*, 585 U.S. at 930. The notion that a person has a culpable *mens rea* merely when encouraging the exercise of constitutional rights is bizarre. But it is hard to deny that opt-outs harm the union financially, even though that financial harm is the direct and inevitable effect of individuals exercising their constitutional rights.

76. Chapter 307's unusual enforcement mechanism amplifies the law's fatal vagueness flaws. Oregon's decision to vest unions with the power to decide when to bring enforcement actions effectively delegates censorship authority to the same unions that drafted the law and benefit from the law.

77. Nor, given the massive penalties that Chapter 307 promises, is there a realistic possibility of judicial decisions providing clarifying guidance before massive amounts of speech are chilled or before the debate about union membership is skewed by the very unions that secured the law and will wield its enforcement. Chapter 307 empowers union parties to collect $6,250 in statutory damages "per incident" of purported impersonation, along with "any other damages" that

the plaintiff can prove. §4(a)-(b). If the law's sponsors are correct, those damages accrue for every single piece of mail found unlawful. *See* Oregon State Legislature, Senate Chamber, at 2:10:08-2:11:43 (May 28, 2025), https://tinyurl.com/6jyx4d4v. Hence, if the Freedom Foundation sends just a single piece of mail to every public-sector union member in Oregon, it risks incurring over *$887 million* in statutory damages alone if that mailer is later deemed to have violated Chapter 307. The disproportionate penalties that attach to engaging in the proscribed conduct—whatever that includes—substantially worsens the First Amendment chill that Chapter 307 causes.

## PRAYER FOR RELIEF

The Freedom Foundation respectfully prays that this Court:

a. issue an order and judgment declaring that Chapter 307 is unconstitutional;

b. issue an order and judgment declaring that Chapter 307's provisions are unlawful as applied to the Freedom Foundation's communications;

c. enjoin, preliminarily and permanently, the implementation and enforcement of Chapter 307 against the Freedom Foundation;

d. award the Freedom Foundation costs and reasonable attorneys' fees, as appropriate; and

e. grant any other relief the Court finds just and appropriate.

Dated:  December 31, 2025                    Respectfully submitted,


                                            By: /s/ *Rebekah Schultheiss*

                                            REBEKAH SCHULTHEISS, OSB No. 121199
                                            FREEDOM FOUNDATION
                                            PO Box 552
                                            Olympia, WA  98507
                                            RSchultheiss@FreedomFoundation.com
                                            360.956.3482

                                            PAUL D. CLEMENT (*pro hac vice forthcoming*)
                                            ANDREW LAWRENCE (*pro hac vice forthcoming*)
                                            PHILIP HAMMERSLEY (*pro hac vice forthcoming*)
                                            CLEMENT & MURPHY, PLLC
                                            706 Duke Street
                                            Alexandria, VA  22314
                                            Paul.Clement@clementmurphy.com
                                            Andrew.Lawrence@clementmurphy.com
                                            Philip.Hammersley@clementmurphy.com
                                            202.742.8900

                                            *Attorneys for Plaintiff*